**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| COLLINS ASSET GROUP, LLC | ) | Case No. 25-10994-LSS |
| | ) | |
| Debtor. | ) | |
| | ) | |
| In re: | ) | Chapter 7 |
| | ) | |
| HOLLINS HOLDINGS, INC. | ) | Case No. 25-10995-LSS |
| | ) | |
| Debtors. | ) | |

---

**MOTION OF PLAINTIFFS AND RECEIVER FOR FERRUM CAPITAL, LLC AND
FERRUM IV, LLC TO TRANSFER VENUE OF BANKRUPTCY CASES**

---

COME NOW JUDY A. MUSGROVE *et al*., and RANDY SPARKS *et al*., together with

their fellow PLAINTIFFS,[1] and J. PATRICK LOWE, the Receiver for Ferrum Capital, LLC and

Ferrum IV, LLC, (collectively the "**Movants**") and file this their *Motion of Plaintiffs and Receiver*

*for Ferrum Capital, LLC and Ferrum IV, LLC to Transfer Venue of Bankruptcy Cases*, pursuant

to 28 U.S.C. §§ 1404(a), 1412, and rule 1014(a)(1) of the Federal Rules of Bankruptcy Procedure

(the "**Bankruptcy Rules**"), respectfully stating as follows:

<u>**SUMMARY OF RELIEF REQUESTED**</u>

1.     Venue for the no-asset Chapter 7 liquidation cases of Collins Asset Group, LLC

("**CAG**") and Hollins Holdings, LLC ("**Hollins**") (collectively the "**Debtors**") should be

---

[1]     There are 75 Plaintiffs including Ms. Musgrove and Mr. Sparks, all of whom are identified in **Exhibit 1** attached hereto along with each of the other Exhibits referenced herein.  The Plaintiffs have each filed proofs of claim in Bankruptcy Case No. 24-50037, *In re Michael L. Cox*, pending in the Northern District of Texas, Lubbock Division, a case that is related to this case as explained below.  Virtually all of the Plaintiffs are residents of the State of Texas residing primarily in San Antonio, Texas and Lubbock, Texas, except for seven who reside in Nevada, New Mexico, and Mississippi.  Of those seven, three reside in New Mexico and are members of the same family.  The Plaintiffs request that the Court take judicial notice of their filed proofs of claim as further evidence of their residency.

transferred to the Bankruptcy Court for the Western District of Texas in the interest of justice and for the convenience of all the parties.  In one-hundred and one distinct dependent[2] promissory notes, the Debtors and Ferrum Capital, LLC, agreed that "[v]enue for any action arising from or related to this agreement shall be exclusively in the State or Federal Court located in Travis County, Texas."  *See* **Exhibit 2**, Sample CAG-Ferrum Capital Promissory Note.  Travis County, Texas is located in the Western District of Texas.

2.      The U.S. Supreme Court has made clear that the party defying a forum selection clause "bears the burden of establishing that the transfer to the forum for which the parties bargained for is unwarranted."  *See Atl. Marine Const. Co., Inc., v. U.S. District Court for the Western District of Texas, et. al.*, 571 U.S. 49, 62 (2023) (interpreting 28 U.S.C. § 1404 (the general venue change statute)).  In this circumstance, the Debtors or the Chapter 7 Trustee in Delaware (who steps into the Debtors' shoes) cannot carry that burden.

3.      The Debtors' Chapter 7 petitions were filed less than four hours before a scheduled status conference to set a trial date in the pending action, *Musgrove, et al., v. Brooklyn Chandler Willy, et al.*, 438th District Court, Bexar County, Texas, Case No. 2023CI22575 (the "**Texas Litigation**"),[3] where Movants' claims against Debtors and Oliphant, Inc., Oliphant Financial, LLC, and Oliphant USA, LLC (collectively the "**Oliphant Parties**") for securities law violations and related frauds have been pending since October of 2023.  On January 5, 2024, Patrick Lowe

---

[2]     As will be explained in greater detail below, there are two sets of notes at issue here.  The primary notes were issued by Ferrum Capital, LLC to the Plaintiffs to evidence the indebtedness owed to the Plaintiffs for their investments.  The "dependent" notes were issued by CAG to Ferrum Capital to evidence the debt CAG owed to Ferrum Capital.  Ferrum Capital describes the CAG Notes as "dependent."  Repayment on the investor/Plaintiffs' notes was "dependent" on payment by CAG of its notes to Ferrum Capital.

[3]     The Plaintiffs are mostly retirees residing in Texas. The Plaintiffs, their losses and residency are listed in **Exhibit 1**.  The Defendants are Michael Cox, Joshua Allen, Walt Collins, Collins Asset Group, LLC, Oliphant Financial, LLC, Oliphant USA, LLC, Accelerated Inventory Management, Hollins Holding, Inc., Ryan Project Funding, LLC, Robert Ryan, Brooklyn Chandler Willy, Queen B Advisors, LLC, Yvette Barrera, MLC Financial, Inc., MCKC Services, LLC and MKMH Interest, LLC.

was appointed as the receiver under Texas law in the Texas Litigation for Ferrum Capital, LLC, ("**Ferrum Capital**") and Ferrum IV, LLC ("**Ferrum IV**").  The gravamen of the Plaintiffs' complaint is that Ferrum Capital sold unregistered securities (promissory notes) to unsophisticated investors, the repayment of which were "dependent" on another unregistered promissory note issued by Collins Asset Group, LLC, and its manager, Hollin Holdings, LLC.

4.      Ferrum Capital was a *Ponzi* scheme; Ferrum IV, LLC was just a fraud.[4]  The Plaintiffs lost $37,322,349.48 in the Ferrum-CAG frauds.  The total losses for all investors in Ferrum Capital are estimated to be in excess of $60,000,000.00.

5.      Principally located and operating in Austin, Travis County, Texas, CAG issued one-hundred and one separate dependent promissory notes to Ferrum Capital for a total face amount of $59,479,413.11 in exchange for most of the Ferrum Capital investor money.  *See* **Exhibit 3**, Excerpt from Jack Davis deposition.  CAG started issuing the dependent notes to Ferrum Capital in 2017.  The last dependent note was issued by CAG on June 27, 2023.  The dependent notes from CAG to Ferrum Capital were identical except for the note amount and date.  Although Ferrum Capital was the largest source of capital for CAG, CAG issued similar notes to other lenders in an amount estimated to be in excess of $20,000,000.00.  Those lenders also agreed upon exclusive venue in Texas.

6.      The CAG/Ferrum dependent notes were marketed as being fully secured by portfolios of defaulted debt that CAG purchased and serviced.  CAG's bankruptcy schedules reveal that its affiliates, the Oliphant Parties, are the de facto servicers of these portfolios and that all the proceeds therefrom apparently have been retained with the Oliphant Parties, not CAG.  The

---

[4]      While Ferrum Capital used some of the investor money it raised to pay the earliest investors, Ferrum IV simply stole investor money.

representations and covenants made by CAG and Ferrum to the Plaintiffs that their investment funds would be used to fund the purchase of portfolios by CAG and that CAG would service those portfolios and use the proceeds to repay the investors (with interest) were false.

7.      Although the Debtors are both incorporated in the state of Delaware, they have no operations, virtually no creditors, no employees, no offices and no other connections to Delaware. The Oliphant Parties have already removed the Texas Litigation to the Bankruptcy Court for the Western District of Texas, effectively placing venue for the entire dispute in Texas.  Transferring venue of the main case to the Western District of Texas, as the Debtors and the creditors had agreed at the inception of their relationship, will reduce the expense of litigation and centralize all the claims against the Debtors and their affiliates in a single forum.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Pursuant to 28 U.S.C. §§ 1404 and 1412 and Bankruptcy Rule 1014(a)(1), in the interest of justice and for the convenience of the parties, venue should be transferred to the United States Bankruptcy Court for the Western District of Texas.

9.      Pursuant to Local Rule 9013-1 of the Local Rules of the United States Bankruptcy Court for the District of Delaware, the Movants consent only to the entry of a final order or judgment by this Court with respect to the attendant Motion.  The Movants do not otherwise consent to the entry of final orders or judgments by this Court in these pending bankruptcy cases if it is determined that the Court cannot enter final orders or judgments consistent with Article III of the United States Constitution.  The Movants hereby reserve and preserve their rights with respect to the same.

## FACTUAL BACKGROUND

10.     Ferrum Capital, LLC and Ferrum IV, LLC, are Texas LLCs, co-owned by co-defendants, Joshua L. Allen and Michael L. Cox.[5]  Ferrum Capital, LLC was formed in 2017 to exclusively raise capital for CAG by inducing retired and unsophisticated senior citizens to invest money into Ferrum Capital.  The investments peddled by Ferrum Capital were unregistered securities in the form of promissory notes that promised 8-10% returns over four years.  Each note issued by Ferrum Capital to its investors was secured by a "dependent" promissory note issued by CAG to Ferrum Capital.  *See* **Exhibit 4,** Ferrum Commercial Lending Program Marketing Materials.  The vast majority of the Ferrum Capital and Ferrum IV investors are located in San Antonio and Lubbock, Texas.

11.     Between 2017–2023, the Ferrum entities raised over $70,000,000.00 from Plaintiffs and other investors and transferred those funds to CAG in Travis County, Texas to finance CAG's purchase of and sale of distressed accounts receivable, with the collections from the purchased receivables pledged as collateral to Ferrum Capital.  The Ferrum Capital investors were to be repaid the principal of and interest on their investments with the proceeds of the accounts receivable that CAG purchased.  Ferrum Capital stepped in to fill a void in financing for CAG left when the prior Ponzi scheme CAG had been relying upon for financing, Sonoqui, failed and filed for bankruptcy.[6]

---

[5]     Mr. Cox, Mr. Allen, and Ms. Brooklyn Chandler Willy—another defendant who sold the unregistered Ferrum Capital and Ferrum IV notes, have all been deposed or examined and asserted their constitutional rights against self-incrimination in connection with the Ferrum transactions and declined to provide testimony to the Movants.

[6]     On December 10, 2020, a class action lawsuit was filed in the U.S. District Court for the Northern District of Georgia, alleging that CAG and its cohorts ran an investment scheme whereby they raised investment capital from investors to fund their business operations.  *See Stephen Thaxton et al v. Collins Asset Group, LLC, et al.,* Case No. 1:20-cv-00941-ELR, (N.D. GA, June 21, 2021) (the "**Sonoqui Lawsuit**").  On June 21, 2021, U.S. District Judge Eleanor Ross entered a final order and judgment in the Sonoqui Lawsuit reimbursing the plaintiffs for their loss.  *See* Final Order and Judgment at Dkt. No. 79.  Similar to the claims made by Plaintiffs

12.     CAG issued unregistered dependent promissory notes to Ferrum Capital in exchange for the funds that it received.  Each of the one-hundred and one CAG-Ferrum promissory notes issued to Ferrum Capital were collateralized by the portfolios of distressed accounts receivable purchased by CAG.  All of these dependent notes between CAG and Ferrum Capital contained a mandatory and exclusive choice of venue provision in Travis County located within the Western District of Texas.  Each of the CAG-Ferrum dependent notes were for a four-year term with interest either payable quarterly at 8% or at 10% if payment was deferred until the expiration of the note at the four-year maturity.

13.     The Ferrum-investor notes followed suit using the same terms as the underlying CAG-Ferrum dependent notes.  Both sets of notes were recourse only to the "Collateral," a defined term in the Master Loan Agreement (§ 1.1 and § 11.12) limited to the specific proceeds from collections of the specific portfolios pledged to Ferrum Capital in each CAG-Ferrum note.  *See* **Exhibit 5**, CAG-Ferrum Master Loan Agreement.  The calculation of the recourse amount due on the dependent notes is diminished by a deduction for "fees and expenses due Maker's agents, representatives and attorneys relating to the Maker's Efforts."  The deductions for Maker's Efforts cannot exceed 65% of the "Net Proceeds," with Ferrum Capital receiving "no less than thirty-five percent of the Net Proceeds" as defined in section 6 of the dependent notes.  Nothing in the dependent notes or the Master Loan Agreement suggests that CAG can deduct any amount for its overhead or other expenses of collection.[7]

---

in the Texas Litigation, Judge Eleanor Ross found that defendants used intermediaries as part of a scheme to raise money to fund different companies giving plaintiffs promissory notes in exchange for their money that was subsequently loaned to CAG and other entities.  *See id.*  The principals of Sonoqui were convicted of securities fraud.

[7]     CAG also agreed in the Master Loan Agreement to: "maintain records sufficient to determine which consumer debts, accounts, instruments, and other property constitutes Collateral for each Term Loan, to determine the Collins Proceeds, and to determine the consumer debts, accounts, instruments, and other

14.     Starting in 2020, CAG also lent money to the Oliphant Parties raised through the CAG-Ferrum dependent notes.  The CAG-Oliphant Parties' promissory notes were identified in corresponding CAG-Ferrum dependent notes as collateral, and again in the corresponding Ferrum-Investor dependent notes.  Each of the CAG-Oliphant Parties' promissory notes contain the same choice of venue provision contained in all of the other dependent notes—placing venue of a dispute between CAG and the Oliphant Parties squarely in the Western District of Texas as well.  *See* **Exhibit 6**, Sample CAG-Oliphant Note.

15.     The $70,000,000.00 lent by Ferrum Capital to CAG has now in large measure disappeared.  CAG furnished a report on collections to Ferrum Capital for purposes of Ferrum Capital's certification to the Receiver regarding its assets.  The certification provided to the Receiver using CAG's collection report states that CAG had collected approximately $50,000,000.00 on portfolios purchased with Ferrum Capital investor funds prior to July of 2023.  However, the same report reflected that CAG owed no additional monies to Ferrum Capital because the expenses associated with its "Maker's Efforts" were 64.5% of the portfolio collections (and coincidentally the Master Loan Agreement cap was 65%).  No substantiation or accounting for such "Maker's Efforts" was provided in the report.  CAG's most recent reporting in its bankruptcy schedules states that it has received almost $6,800,000.00 in revenue since October of 2023, but that only a pittance of that sum ($1,330.15) remained in its bank account as of the Petition Date.  CAG's other assets consist of portfolio receivables, which CAG valued at $10,647,402.38 as of December 31, 2023, a customer list valued at an unknown amount, interests in tax refunds of

---

property that were not purchased with each Term Loan Proceeds under this Loan Agreement and are not Collateral for the Promissory Notes or other Obligations under these Loan Documents."  No evidence was presented in the Texas Litigation that CAG ever kept records for the expenses associated with its purported Maker's Efforts.

unknown amounts and litigation for breach of contract pending in various states—many in Texas. *See* CAG Bankruptcy, Dkt. No. 19, pp. 9-10 and 15-16; and Dkt. No. 18, pp. 22-124 of 225.[8]

16.    The questions of fact and law in the Texas Litigation and this bankruptcy proceeding will be the same as they relate to the Ferrum Receiver and CAG:  (i) what is the amount of Ferrum Capital's secured interest in CAG collateral, (ii) if not remitted to Ferrum, where did the collateral (and proceeds of that collateral) end up, and (iii) the amount CAG owes the Receiver under the non-recourse promissory notes.  The promissory notes define Ferrum Capital's and CAG's interest in CAG collateral to be *no more* than 65% of collections for reimbursement to CAG for its Maker's Efforts and *at least* 35% to Ferrum Capital.   To date, the fight has been about what the "no more" and "at least" language means in the context of the Ferrum-CAG notes (i.e., whether they are a cap or a floor on what each party receives).  The evidence from CAG's books and records to date is clear that, other than tracking the third-party collection expenses (defined in section 6 of the dependent notes as "fees and expenses due Maker's agents, representatives and attorneys' related to the Maker's Efforts"), no other expenses were recorded as an expense of CAG's collections.  CAG's records show that third-party collection expenses historically ran between 20% to 30% of collections, meaning that at least two-thirds of the gross amount collected would consist of net proceeds securing the payment of the CAG-Ferrum notes.  Said another way, if CAG collected $100 on the "Collateral," Ferrum Capital (and now the Receiver) would have a secured interest in those proceeds of between $70 to $80 depending on how much was paid in third-party fees and expenses to collect the money.

---

[8]    The Debtors list just one pending action in Delaware, *Collins Asset Group, LLC v. Willie McCray*, which appears to be a collection action by CAG.  The Debtors also list several pending actions where the jurisdiction is apparently "unknown".   However, even assuming arguendo that these various "unknown" actions are pending in Delaware, the vast majority of the actions listed on the Debtors' schedules are pending outside of Delaware.  Moreover, the Oliphant Parties are the entities servicing the debt underpinning these (what appear to be) pending collection actions, and they are located in Austin, Texas—not Delaware.  Therefore, this fact does not support retaining venue in Delaware.

17.     As Movants have discovered in the Texas Litigation, the Debtors stopped keeping accurate books and records of the monies collected from the portfolios sometime in late 2021, after Mr. Conway and Mr. Pope bought out the founder of CAG, Mr. Walt A. Collins.

18.     From 2017 until the appointment of the Receiver in January of 2024, Ferrum Capital never asked for or received an accounting of the collections made on the account portfolios pledged as "Collateral" or the amount of the expenses associated with "Maker's Efforts" or the amount of recourse money owed by CAG to the Ferrum Capital.  Since the filing of the Texas Litigation and the appointment of the Receiver, CAG and Oliphant's lawyers have delivered reports utilizing methodology that CAG was entitled to deduct 64.5% of the money collected from the Collateral without regard to its actual costs, not once but twice, resulting in a net 12% of Collateral collections paid to the Receiver.  It appears likely that CAG (and likely the Oliphant Parties) never kept track of the monies owed to Ferrum Capital—whether that omission was an oversight or just a symptom of fraud is at least one of the disputes between the parties.

19.     Based on the information in the Debtors' petitions and their schedules, it appears that the contentions raised by CAG about what was due for "Makers Efforts" during the many months of the Texas Litigation was just a ruse to buy time.  The truth is that the Oliphant Parties and their managers Mike Pope and Colin Conway took control of the collateral and all of CAG's money following the buyout of CAG from Walt Collins and then failed to track or account for the assets pledged as collateral.  The Oliphant Parties and their owners and managers (being the same owners and managers of the Debtors) never attempted to quantify or keep a record of any amounts owed to CAG for "Maker's Efforts" apart from the fees and expenses paid to outside collection agencies and law firms.  The real issue is where are the proceeds collected over time on the pledged portfolios?

20.    CAG's Statement of Financial Affairs shows that it is principally located in Austin, Texas.  Other than being the state of their incorporation many years ago, the Debtors list no assets, records or persons relevant to these bankruptcy proceedings in Delaware.  The Debtors' mortgage loan documents and books and records are admitted to be in the possession of the Oliphant Parties.  All of the Oliphant Parties assert that their offices are located at the same address as the Debtors' in Austin, Texas.  All of the Debtors' officers and directors are located in Austin, Texas.  *See* CAG Bankruptcy Case, Dkt. No. 18, Statement of Financial Affairs, Questions 14.1, 20.1, 26 & 28; *see* Hollins Bankruptcy Case, Dkt. No. 16, Statement of Financial Affairs, p. 16 of 18.  The Debtors' prior parent companies are identified as the Oliphant Parties, each of whom assert that they are headquartered in and/or conduct business in Austin, Texas.  The Western District of Texas encompasses both Austin and San Antonio.

21.    In 2020, the Texas State Securities Board found that the Ferrum notes were securities and sanctioned Ferrum affiliate and CAG co-defendant, Brooklyn Chandler Willy, for selling these securities without the appropriate license.  *See* **Exhibit 7**, TSSB Order.

22.    As late as May of 2023, the Debtors' principals, Collin Conway, Michael Pope (the manager of Skypeak Fund I, LP), together with other employees of the Oliphant Parties and Ferrum co-owner, Michael Cox, were hosting Ferrum investors for marketing events in Austin, Texas.  They invited these investors, some of whom are Plaintiffs in the Texas Litigation, to a well-known country club to convince them that their investments in Ferrum Capital were safe and sound investments, all backed by the CAG-Ferrum dependent notes and the debt portfolios CAG purchased with their money.  The gathered Ferrum investors were not told that CAG no longer had any employees, or that CAG itself was no longer receiving into its bank accounts cash collections made on the pledged portfolios, or that the Oliphant Parties were now the ones collecting (and

using) proceeds from the pledged collateral.  They were not told that after 2021, none of the funds that CAG received from Ferrum were actually used to purchase new debt portfolios or that no new collateral had been acquired or pledged to support any of the CAG-Ferrum notes issued over the past three years.  The slides presented by the managers and employees of the Oliphant Parties at the investor meeting failed to disclose that proceeds collected on the pledged collateral had not been used to pay back the CAG-Ferrum notes but had instead been transferred up to the Oliphant Parties and were no longer under CAG's control.  The managers of the Oliphant Parties failed to mention that the funds derived from investments would simply be used to pay off other maturing Ferrum-CAG notes, as CAG no longer had possession of the proceeds pledged as collateral for the notes.

23.     Because CAG started issuing CAG-Ferrum Capital dependent notes in late 2017, the earliest issued dependent notes started to come due in 2021 and thereafter, per their original four-year terms.  Because the proceeds collected on collateral for these notes were no longer available to pay out, Ferrum Capital and CAG started rolling over the dependent notes.  Ferrum investors were convinced not to cash in their notes, but to roll over their principal and earned interest into newly issued four-year dependent notes.  Unbeknownst to the investors, this allowed Ferrum to collect from CAG another 15% commission and 2.5% servicing fee, while at the same time allowing CAG to defer paying out cash for principal and interest due on the maturing CAG-Ferrum dependent notes for another four years.  No new debt portfolios were acquired or pledged in the process, leaving the Ferrum investor secured only by the diminishing collections on the old collateral.  Most of the first forty of the one-hundred and one notes were "rolled-over" in this fashion.  After 2021, some investors were paid back, some investors reinvested in return for newly issued dependent notes, and new investors were continually brought in by Ferrum to continue

funding the scheme, with new funds used to pay off older CAG-Ferrum notes and their dependent Ferrum-Investor notes.  As of CAG's bankruptcy petition, there are fifty-seven unpaid dependent notes for a total face value of $47,025,622.23. *See* **Exhibit 8**, Declaration and Expert Report of Greg Murray.

24.    In November 2023, CAG (or better said, the Oliphant Parties) apparently ran out of money, and defaulted on the loan payments pursuant to the dependent notes; causing Ferrum Capital to default on the notes owed to the Plaintiffs.  At about the same time in 2023, Oliphant United, the ultimate parent of all of CAG and the Oliphant affiliates, spun the ownership of Hollins Holdings, LLC, out to its investors—probably anticipating a later bankruptcy filing by the Debtors.

25.    Faced with an onslaught of lawsuits in 2023 for securities fraud, and as described in more detail in the next section, Mr. Michael Cox, the principal of Ferrum Capital, made the fateful decision to personally file for bankruptcy protection in the Northern District of Texas (Lubbock Division).  Mr. Cox eventually disclosed in his schedules that sometime in 2021, through one of his or his wife's trusts, he became a limited partner in SkyPeak Fund I, L.P.  Skypeak Fund I, LP, is an equity owner of Hollins Holdings, LLC, and the Oliphant Entities, and managed by Mr. Michael Pope, an attendee at the investor meeting held at the country club in Austin, Texas, in May of 2023.

26.    Ms. Willy, an agent for Ferrum Capital, was indicted in December 2024 in the Western District of Texas for securities law violations and obstruction of justice.

27.    Plaintiffs, through their expert's forensic accounting, have determined that Ferrum Capital collected over $60,000,000.00 from investors like the Plaintiffs, kept millions in the form of unlawful commissions, and transferred approximately $50,000,000.00 to CAG.  Approximately $17,000,000.00 was returned from CAG to Ferrum Capital, and a mere pittance was returned to a

few of the Plaintiffs in the form of interest payments. *See* **Exhibit 8**. None of the Plaintiffs ever received the return of their principal investment.

28.     Three weeks ago, the Debtors filed for bankruptcy in Delaware. The Debtors' schedules and SOFA inform the Court's venue decision. The Debtors list their principal place of business in Travis County, Texas. Debtor Hollins Holdings' single asset is 100% ownership in CAG. Hollins Holdings lists no creditors. CAG lists five secured creditors. Of the five secured creditors, none are in Delaware. Ferrum Capital holds the largest lien and was formerly located in Lubbock Texas. Ferrum Capital is now controlled by its Receiver, Mr. Lowe, who is a resident of the Western District of Texas. CAG lists eleven unsecured creditors. Seven are in Texas and none are located in Delaware. Interestingly, while the Texas Litigation is listed, CAG does not list the 75 Plaintiffs in the Texas Litigation, as creditors, although these Plaintiffs have all filed claims against CAG. None of these Plaintiffs reside in Delaware and only seven (7) do not live in Texas. There are other Ferrum Investors that have not filed suit against CAG. The interests of those investors are represented by the Ferrum Receiver. CAG lists its executory contracts in Schedule G[9] such as software subscriptions and offsite storage located at the same location as its books and records in Austin, Texas.

29.     The Hollins Debtor is owned by 11 shareholders, the majority owners of which are Colin Conway- 26.84%, Skypeak Fund I, LP- 26.84% and Robert Morris- 21.23%, none of whom are located in Delaware.

---

[9]     Notably absent from the Debtor CAG's Schedule G is an executory contract between CAG and the Oliphant Parties for the servicing of the portfolios. Since the Oliphant Parties were apparently just converting the proceeds of collections, perhaps from their viewpoint no contract was required.

## PROCEDURAL BACKGROUND

30.     On October 18, 2023, Ms. Musgrove, together with her sister, Kathleen Priebe, filed the Plaintiffs' original petition against Ferrum Capital, LLC, Collins Asset Group, LLC and other Defendants in Texas state court—i.e., the Texas Litigation.  On August 30, 2024, with the joinder of other investors, Plaintiffs filed their first amended petition, adding many of the affiliates of the Oliphant Parties, and several other Defendants in the Texas Litigation.

31.     The Plaintiffs' claims stem from CAG and the co-defendants' fraudulent business conduct in Texas and are based on contracts and agreements entered into in Texas as described above.  The Plaintiffs sued CAG and the other Defendants for fraud, theft, breaches of fiduciary duty and Texas securities law violations as either an issuer of unregistered securities, or a control person or aider and abettor of the fraud.  *See* **Exhibit 9**, Second Amended Petition. The Plaintiffs allege that Ferrum Capital was a Ponzi scheme.

32.     On January 5, 2024, upon application of the Plaintiffs, the Bexar County District Court appointed John Patrick Lowe as receiver of the Ferrum Entities. *See* **Exhibits 10-11** Order and Oath of Receiver.

33.     On February 20, 2024, Michael Cox filed a Chapter 11 Petition in the United States Bankruptcy Court for the Northern District of Texas, Lubbock Division, Case No. 24-50037.  Mr. Cox's Chapter 11 was subsequently converted to a Chapter 7 proceeding.[10]

---

[10]     On May 31, 2024, and December 23, 2024, the Plaintiffs brought two adversary proceedings against Mr. Cox in his bankruptcy case excepting to his discharge under 11 U.S.C. §§ 523(a)(2)(4)(6) and (19), styled *Musgrove, et al. v. Cox*, Adversary Proceeding No. 24-05006; and *Sparks, et al. v. Cox*, Adversary Proceeding No. 24-05002.  By Orders dated April 25, 2025, and May 23, 2025, the United States Bankruptcy Court for the Northern District of Texas, Lubbock Division entered a Partial Summary Judgment and subsequently a Final Judgment on the Musgrove Plaintiffs' claims for securities law violations against Michael Cox in the *Musgrove, et al. v. Cox* Adversary Proceeding.  *See* Dkt. Nos. 33 and 37.  On June 12, 2025, the bankruptcy court orally granted the Sparks Plaintiffs' Motion for Default Judgment in the *Sparks, et al. v. Cox* Adversary Proceeding.  On June 24, 2025, the bankruptcy court granted the Sparks Plaintiffs' Motion for Default Judgment in the *Sparks, et al. v. Cox* Adversary Proceeding.

34.     On September 10, 2024, the Receiver joined in the Texas Litigation and filed his original petition against CAG based on the CAG/Ferrum Notes.  On March 17, 2025, the Receiver filed his amended petition adding Oliphant Financial, LLC, Oliphant USA, LLC, Accelerated Inventory Management, LLC, Hollins Holdings, LLC, Joshua L. Allen and Brooklyn Chandler Willy for breach of contract, and fraudulent transfers related to the CAG notes owed to Ferrum. *See* **Exhibit 12**, Receiver's First Amended Petition Against Collins Asset Group, LLC et al.

35.     CAG and Oliphant had joint common counsel during the pendency of the Texas Litigation until CAG filed for bankruptcy.  The Receivership Order ordered the managers of Ferrum Capital, Mr. Cox and Mr. Allen, to account for assets to the Receiver.  Mr. Cox and Mr. Allen turned to CAG for the first report ever prepared on the Collateral and attached it to a certification filed with the court.  The Receiver then called upon CAG to account for and pay over to the Ferrum Estate the accounts receivable that CAG had received and not paid to Ferrum Capital, going back to 2017.  During the Receivership thus far, CAG paid the Receiver $266,649.11 in June 2024.  In January 2025, Oliphant paid the Receiver $536,761.22.  *See* **Exhibit 13**, Declaration of Patrick Lowe.

36.     CAG and the Oliphant Entities through their joint counsel provided collection reports to the Receiver showing collections totaling 6,800,000.00 in three time periods—October 2023 to May 2024; June 2024 to December 2024; and January 2025 to April 2025.  What is disclosed in CAG's bankruptcy schedules is that it prepared its bankruptcy schedules based upon year-end 2023 financial statements—underscoring the Movants' suspicions and concerns that CAG has not kept a set of books since 2023.  Logically following this fact pattern, the collection reports produced to the Receiver were prepared by the Oliphant Entities.

37.     Also pending when these bankruptcy petitions were filed, was the Receiver's Motion to Enforce the Receivership Order to require CAG/Oliphant to pay the Receiver on post-January 2023 collections.  *See* **Exhibit 14**, Receiver's Motion to Enforce.  This motion called upon CAG to pay monies generated from collections of the Collateral to the Receiver.

38.     On June 4, 2025 (the "**Petition Date**") the Debtors filed bankruptcy petitions under title 11 of the United States Code, hours before a scheduled Status Conference in the Texas Litigation.  *See CAG and Hollins Bankruptcy Cases*, Dkt Nos. 1.

39.     Trial in the Texas Litigation is set for two weeks beginning October 16, 2026.

40.     On June 6, 2025, two days after the Debtors filed their bankruptcy cases, their affiliate and Co-Defendant, the Oliphant Parties, filed a notice of removal of the entire Texas Litigation to the United States Bankruptcy Court for the Western District of Texas.  *See* Adversary Proceeding No. 25-05047-CAG.  Oliphant's counsel indicated during a conference call on June 10, 2025, with counsel for the Movants that Oliphant does not intend to transfer the removed Texas Litigation to this Court and indeed no such motion has been filed by the Oliphant Parties to date. Given the choice of venue and waiver provisions in all of the notes issued by CAG (and Oliphant) placing venue in the Western District of Texas, even if such a Motion were filed, the likelihood of success seems remote at best.

41.     As of the Petition Date, the following discovery matters were pending in the Texas Litigation:

> 1.   Deposition of Walt Collins, an insider of Collins Asset Group.
>
> 2.   Deposition of Collins Asset Group's corporate representative.

42.     In addition, to the above-described litigation, three other cases stemming from the Ferrum Capital nucleus of facts remain pending in Texas:

1.  Musgrove, et al. v. Cox, 438th District Court, Bexar County, Texas, Case No. 2024CI26337.

2.  Musgrove, et al. v. Wealth Watch Advisors, Inc., Adv. Proceeding No. 25-05002 NDTX, Ft. Worth.

3.  Sparks, et al. v. Wealth Watch Advisors, Inc., 4th Div. Bexar County, 25-BC04A-0009.

## ARGUMENTS AND AUTHORITIES

**A.**    **Venue Statutes Governing a Case under Title 11.**

43.    Venue is proper in a district "in which the domicile, residence, principal place of business in the United States, or principal assets in the United States, of the . . . entity that is the subject of such case have been located for the one hundred and eighty days immediately" preceding the petition date.  28 U.S.C. § 1408.  The Debtors are domiciled in Delaware.

44.    Venue can be transferred, however, from one district to another "in the interest of justice or for the convenience of the parties."  28 U.S.C. § 1412.  *See also* Fed. R. Bankr. P. 1014(a).

45.    The "'interest of justice' component of § 1412 is a broad and flexible standard which must be applied on a case-by-case basis."  *Gulf States Exploration Co. v. Manville Forest Products Corp. (In re Manville Forest Products Corp.)*, 896 F.2d 1384, 1391 (2d Cir. 1990)).

46.    As part of this determination, courts primarily consider "whether transferring venue would promote the efficient administration of the bankruptcy estate, facilitates judicial economy, timeliness, and fairness."  *See id.* at 1391; *In re Qualteq, Inc.*, No. 11-12572, 2012 WL 527669, at *6 (Bankr. D. Del. Feb. 16, 2012); *see also Zazzali v. 1031 Exch. Grp. (In re DBSI, Inc.)*, 478 B.R. 192, 198 (Bankr. D. Del. 2012) (noting that the forum in which the debtor has its primary operations is favored); *DHP Holdings II Corp. v. The Home Depot, Inc. (In re DHP Holdings II Corp.)*, 435 B.R. 264, 275 (Bankr. D. Del. 2010).

47.    Delaware bankruptcy courts consider the following factors to determine whether transfer of a bankruptcy proceeding is warranted under 28 U.S.C. § 1412 in the interest of justice and the convenience of the parties: (1) the location of the Plaintiff and Defendant; (2) the ease of access to necessary proof; (3) the availability of subpoena power for the unwilling witnesses; (4) the expense related to obtaining willing witnesses; (5) the enforceability of any judgment rendered; (6) the ability to receive a fair trial; (7) the state's interest in having local controversies decided within its borders, by those familiar with its law; and (8) the economies of estate administration. *See In re Rehoboth Hosp., LP*, No. 11-12798 KG, 2011 WL 5024267 at *3 (Bankr. D. Del. Oct. 19, 2011). As for the convenience of the parties, the factors are: (9) proximity of creditors of every kind to the court; (10) proximity of the Debtor; (11) proximity of witnesses necessary to administration of the estate; (12) location of the assets; (13) economic administration of the estate; and (14) necessity for ancillary administration in the event of liquidation. *See In re Shorts Auto Parts of Warren, Inc.*, 136 B.R. 30, 34 (Bankr. N.D.N.Y. 1991).

48.    In addition, borrowing from venue transfer analysis under 28 U.S.C. § 1404(a) in federal district court cases, Delaware bankruptcy courts consider the following public and private interest factors when determining whether a transfer of venue for a bankruptcy case is appropriate: (15) the original choice of forum; (16) the requested forum; (17) whether the claim arose elsewhere; (18) location of books and records and/or the possibility of viewing premises, if applicable; (19) convenience of the parties as indicated by their relative physical and financial condition; (20) convenience of the witnesses—but only to the extent that the witnesses may actually be unavailable for trial in one of the *fora*; (21) enforceability of the judgment; (22) practical considerations that would make the trial easy, expeditious, or inexpensive; (23) the relative administrative difficulty in the two *fora* resulting from congestion of the courts' dockets;

(24) the public policies of the *fora*; (25) the familiarity of the judge with the applicable state law; and (26) the local interest in deciding local controversies at home. *See In re Qualteq, Inc.*, No. 11-12572, 2012 WL 527669, at *5, citing to *In re Innovative Commc'n Co.*, 358 B.R. 120, 126 (Bankr. D. Del. 2006) (holding the factors under 28 U.S.C. § 1404(a) to be relevant to transfers of venue in the context of section 1412); *Zazzali v. 1031 Exch. Grp. (In re DBSI, Inc.)*, 478 B.R. 192 at 194-95; *see also Jumara v. State Farm Ins. Co.,* 55 F.3d 873, 879-80 (3d Cir. 1995).

49.     Ultimately the decision whether to transfer venue to another district is within the sound discretion of the bankruptcy court. *See In re Shorts Auto Parts of Warren, Inc.*, 136 B.R. at 34. However, the U.S. Supreme Court has severely limited that discretion when the parties have incorporated a choice of venue provision in their agreements. *See, e.g., Atl. Marine*, 571 U.S. at 49. The party defying the forum selection clause "bears the burden of establishing that the transfer to the forum for which the parties bargained for is unwarranted." *See id.* at 63.

**B.     Transfer of Venue is Appropriate in the Interest of Justice and for the Convenience of the Parties.**

*Factors 1, 9 and 10: The Location of the Parties and Proximity of Creditors of Every Kind and the Debtors to the Court*

50.     The location of the parties, and the proximity of creditors and debtors to the Court weighs in favor of transferring venue to the Western District of Texas. The Debtors, their pre-bankruptcy professionals, and virtually all of their creditors are in the Western District of Texas. *See In re Qualteq, Inc.*, No. 11-12572 KJC, 2012 WL 527669, at *1, *6 (Bankr. D. Del. Feb. 16, 2012) (giving little weight to debtor's estate professional being in Delaware when the litigation counsel was in the venue where transfer was being requested to be made to).

51.     The Debtors' assets, headquarters, nerve center, books and records are located in the Western District of Texas. The contracts that form the basis of the Plaintiffs' claims have

forum selection/venue clauses setting venue for litigation in the Western District of Texas. Courts are inclined to favor transferring venue to the place where all the parties are residents, or the place where a corporation is well established. *See Bullard v. Burlington Northern Santa Fe Ry. Co.*, 2008 WL 4104355, *6 (N.D. Ill. 2008) ("[W]ere the Court to transfer the case to Texas, the overwhelming majority of the plaintiffs as well as the defendant would be litigating in their home forum, at likely lower cost."). The Oliphant Parties, which have obviously been in control of the Debtors' finances and litigation strategy, have determined that they are not transferring the removed Texas Litigation to Delaware.

52. Further, the proximity of creditors of every kind to the Western District of Texas, favors transfer. The Debtors' schedules do not list any creditors that are located in Delaware. There are 75 Plaintiffs in the Texas Litigation. The Plaintiffs are elderly and retired and now financially compromised and all but a few reside in Texas. Certainly, the physical condition and age of the Plaintiffs and the financial impact of retaining venue in Delaware weigh in favor of transfer. Further, the Ferrum Receiver is located in the Western District of Texas and is well underway investigating the assets and liabilities of Ferrum, which are intimately related to CAG.

### *Factor 2: Ease of Access to Necessary Proof*

53. The ease of access to necessary proof favors transfer because the contracts were entered into in Texas, the witnesses reside in Texas, the Debtors' mortgages and books and records are in Texas, and Oliphant—the Debtors' Co-Defendant, de facto servicer and apparent recipient of the investor funds—is headquartered in Texas. As late as May of 2023, the Debtors' principals, Collin Conway, Michael Pope (Skypeak), and others, including Ferrum's co-owner, Michael Cox, hosted some of Plaintiffs at a local Austin, Texas country club to assure them that their investments were safe and sound. Witnesses to these events will be located at that country club and will be

within subpoena range of the Texas bankruptcy court.  In addition, the books and records of the Plaintiff investors who are retired and Ferrum records sent to the Receiver are voluminous and all their respective counsels' offices are in Texas.

### Factor 3: Availability of Subpoena Power for the Unwilling Witnesses

54.     The availability of subpoena power for the unwilling witnesses favors transfer because Delaware is outside the subpoena power for many of the parties in the Texas Litigation, who do not reside in Delaware.  In *Rehoboth Hospitality*, the Delaware bankruptcy court found that when the availability of the subpoena power for unwilling witnesses are beyond the subpoena power of the court, this factor favored transfer of venue.  2011 WL 5024267 at *3.

### Factor 4: Expense Related to Unwilling Witnesses

55.     As does Factor 3, this factor favors transfer of venue.  Plaintiffs will incur additional expenses related to obtaining unwilling witnesses because none of the witnesses in the Texas Litigation reside in Delaware.

### Factors 5 and 21: Enforceability of Any Judgment Rendered

56.     This factor is either neutral or favors transfer.  While orders from this Court are entitled to full faith and credit in other states, the Plaintiffs, the Receiver, CAG's Co-Defendants, and the assets to satisfy claims in this bankruptcy estate are located outside of Delaware. Therefore, transferring venue would eliminate the costs and time needed to domesticate judgments in Texas.  Further, transferring venue would eliminate the potential expense of post-judgment discovery in Delaware to collect from assets and parties located in Texas.

### Factor 6: The Ability to Receive a Fair Trial

57.     This factor favors transfer. The Plaintiffs' age and financial status will make it unlikely that they can continue to visit their counsel's office if they are forced to hire new counsel

in Delaware or take part in hearings in Delaware to prove their case. Plaintiffs and other parties (who have already been litigating in Texas) will have to hire local attorneys and expend much valuable time informing them and this Court on issues that are already pending in the Western District of Texas.

58.     No less than six related proceedings are all pending in various courts in Texas arising from the same core operative facts from which CAG seeks to escape liability. The Bankruptcy Court for the Northern District of Texas has entered a partial summary judgment finding that Ferrum was a Ponzi scheme and that the sales of the Ferrum notes (which necessarily includes the CAG-Ferrum notes) were made in violation of Texas securities laws.

59.     It appears that the Debtors seek relief in Delaware solely to seek favorable treatment in a new forum and to hinder and delay the Plaintiffs' efforts in prosecuting their claims.

### Factor 7: The State's Interest in Deciding Local Controversies

60.     This factor favors transfer. A bankruptcy court sitting in Texas will have more familiarity with Texas law. *See for e.g. In re Rehoboth Hosp., LP*, No. 11-12798 KG, 2011 WL 5024267 at *3 (determining that a Texas bankruptcy court was uniquely suited to determine issues arising under Texas real property law). Further, Texas has an interest in having local controversies decided within its borders by those familiar with its laws. These claims arise under Texas law. The actions are based in Texas. The Texas Receiver and the Plaintiffs represent the majority of the creditor body of the Debtors' bankruptcy estates with claims totaling at least $60,000,000.00 based on litigation that took place in Texas and that is based on events that occurred largely in Texas involving the Debtors. The causes of action set forth in the Texas Litigation, now removed as an adversary proceeding to the Bankruptcy Court for the Western District of Texas, was the impetus for the Debtors' bankruptcy filing and in no way implicate Delaware law.

### *Factors 8 and 13: The Economies of Estate Administration*

61.      This factor favors transferring venue to the Western District of Texas Bankruptcy Court.  When considering whether a transfer is convenient for the parties, a "court may consider whether a particular court's familiarity with related or parallel litigation favors litigation in that venue." *Delorenzo v. HP Enterprise Services, LLC*, 79 F. Supp. 3d 1277, 1284 (M.D. Fla. 2015); *see also In re Vistaprint Ltd.*, 628 F.3d 1342, 1346, 1367 (Fed. Cir. 2010) (denying a motion to transfer venue, because the trial court in the original venue had become "very familiar" with the issues "during a prior litigation").

62.      The U.S. Supreme Court has held that permitting two cases involving precisely the same issues to be simultaneously pending in different district courts leads to the wastefulness of time, energy and money that § 1404(a) was designed to prevent. *See Continental Grain Co. v. The Barge FBL-585*, 364 U.S. 19 (1960).  Where related lawsuits exist, "it is in the interests of justice to permit suits involving the same parties and issues to proceed before one court." *See Cashedge, Inc. v. Yodlee, Inc.*, 2006 WL 2038504, *1 (D. Del. 2006).  Further "a debtor's obvious attempt to 'escape' the forum best suited for the [estate] administration" should not be condoned. *See In re Qualtec*, 2012 WL 527669, at *7.

63.      Administration of these bankruptcy estates will include investigation into the distressed assets and notes receivables of the Debtors and pursuit of fraudulent transfer claims against insiders of the Debtors such as the Oliphant entities. All of these claims are currently pending in the Western District of Texas.

64.      In addition, Judge Mark Mullin, the bankruptcy judge presiding over the Chapter 7 bankruptcy proceeding of Ferrum Capital co-owner, Michael L. Cox, pending in the Northern District of Texas, Fort Worth Division, entered a partial summary judgment that Ferrum Capital

– 23 –

was a Ponzi scheme, and entered a final judgment in favor of Plaintiffs finding that Michael Cox sold unregistered securities in violation of Texas securities laws and determining that Mr. Cox's $21,000,000.00 debt to the Plaintiffs was non-dischargeable under 11 U.S.C. § 523(a)(19). *See* **Exhibit 15**, Partial Summary Judgment Order; *see also* **Exhibit 16**, Final Judgment.

65. Due to the magnitude and complexity of this case, certainly litigation will exist in different courts, however it is in the best interest of justice and more convenient for all parties in interest for this Court to allow the case to be transferred to the Debtors' agreed upon forum in the Western District of Texas and to have issues that are certain to arise about estate property be determined in Texas.

66. Failing to transfer venue may result in inconsistent decisions from two different bankruptcy courts in two different circuits relating to the same issues, assets and parties. If appeals are taken of rulings, then those issues will have to be heard in two different circuit courts.

### *Factor 11: Proximity of Witnesses Necessary to Administration of the Estate*

67. This factor weighs in favor of transfer. Movants' claims arise out of the Debtors' business activities in Texas and arise under Texas law. The witnesses to the financial transactions will in all likelihood be Oliphant Party principals or employees, who are generally located in Austin, Texas—and not Wilmington, Delaware. The person who signed the Debtors' bankruptcy schedules, Mr. Daniel Laux is an Oliphant employee and lives in the Austin, Texas area. Witnesses to important events that occurred at or close to the Debtors' locations in Texas are in Texas. These witnesses will be needed not only for Plaintiffs' claims against the Debtors but will also be needed as witnesses in causes of action of the estate under chapter 5 of the Bankruptcy Code. If necessary witnesses are outside the subpoena range of Delaware, then the cost of estate administration will be significantly increased.

### Factor 12: Location of the Assets

68.    This factor weighs in favor of transfer.  The main assets, here, are likely chapter 5 causes of action, which relate to promissory notes that were entered into in Texas and contain a forum selection clause that mandates litigation in Texas.  Further, the Debtors' books and records, mortgages and the asset portfolio administered by the Oliphant Entities are located in and managed from Texas.

### Factor 14: Necessity for Ancillary Administration

69.    This factor favors transfer since adversary proceedings that implicate core bankruptcy matters will need to be decided ancillary to the main bankruptcy case.  Already, significant progress has been made in Texas related to these issues.  In addition, as these cases were just commenced in Delaware, this Court has not yet had the opportunity to familiarize itself with the complexities of the Debtors' financial affairs or business.  As such, in the interest of promoting judicial economy, these cases should be transferred to Texas as soon as possible to avoid unnecessary expenditures of this Court's time and resources.

### C.    The Public and Private Interest Factors Weigh in Favor of Venue Transfer

70.    According to the Supreme Court, the private interest factors used to determine venue transfer become largely irrelevant when the parties have entered into a forum selection clause agreeing to litigate in another district, and the "public interests" concerning transfer "will rarely defeat a transfer motion."  *See Atl. Marine*, 571 U.S. at 62.  The party seeking to avoid the contractual choice of forum bears the burden of demonstrating why they should not be bound by their contractual choice of forum.  *See The Bremen v. Zapata Off–Shore Co.,* 407 U.S. 1 (1972).  Therefore, the Court's analysis of factors 15 through 26 should be colored by the Debtors' agreement prepetition to a forum selection clause establishing venue in Travis County, Texas.

### Factor 15: Original Choice of Forum

71.     The original choice of forum favors transfer.  Generally, there is a presumption in favor of maintaining the debtor's choice of forum.  *See In re Borden Chem's. and Plastics Operating Limited P'ship,* 2004 WL 1887532, *2 (Bankr. D. Del. 2004); *In re Ocean Properties of Delaware, Inc.,* 95 B.R. 304, 305 (Bankr. D. Del. 1988).  Nonetheless, the weight afforded to the debtor's choice of forum is diminished when the choice of forum is not directly related to the operative, underlying facts of the case.  *See In re Centennial Coal, Inc.,* 282 B.R. 140, 144-45 (Bankr. D. Del. 2002).  Further, while courts normally defer to a plaintiff's choice of forum, such deference is inappropriate where the plaintiff has already freely contractually chosen an appropriate venue.  *See In re Ricoh Corp.,* 870 F.2d 570, 573 (11th Cir. 1989); *Weiss v. Columbia Pictures Television, Inc.,* 801 F. Supp. 1276 1278, (S.D.N.Y. 1992).  The Debtors freely contracted to litigate all issues pertaining to the dependent promissory notes in the Western District of Texas, waived their right to contest venue in that forum and no deference should be given to their choice to file these cases in Delaware.

### Factor 16: The Requested Forum

72.     This factor weighs in favor of transferring venue.  For all the reasons set forth herein, including the substantial contacts the parties have with Texas, including it being the location of all the events leading to these bankruptcy filings, the pending Delaware bankruptcy cases should be transferred to the Western District of Texas.

### Factor 17: Whether the Claim Arose Elsewhere

73.     This factor weighs in favor of transferring venue because the claims arose in Texas and directly precipitated the Delaware bankruptcy cases.

### Factor 18: Location of Books and Records (to the extent that the files could not be produced in the alternative forum)

74.     This factor weighs in favor of venue transfer.  According to the Debtors' Schedules and Statements of Financial Affairs, mortgage documents and books and records are located in Austin, Texas.  *See* CAG Bankruptcy Case, Dkt. No. 18 & 19; Hollins Bankruptcy Case, Dkt. No. 16 & 17.  While arguably these documents could be electronically produced in Delaware, this would create additional costs to the Movants and to the estates.  Therefore, this factor weighs in favor of transfer.

### Factor 19: Convenience of the Parties

75.     The convenience of the parties, as indicated by the fact that most of the creditors are in Texas and that the Debtors' themselves are located in Texas, weigh in favor of transfer to the Western District of Texas.

### Factor 20: Convenience of the Witnesses (but only to the extent that the witnesses may actually be unavailable for trial in one of the fora)

76.     This factor also weighs in favor of transfer because as set forth above, most of the parties, witnesses and assets are located in Texas and beyond the subpoena power of the Delaware court.

### Factor 22 Practical Considerations that would make the trial easy, expeditious, or inexpensive

77.     For similar reasons that make the Western District of Texas favorable for the efficiency of estate administration—practical considerations that would make the trial easy, expeditious, or inexpensive— such as proximity to the court, location of the parties and site of the acts giving rise to the claims against the Debtor and claims of the Estate, lie in the Western District of Texas and weigh in favor of transfer.

### Factor 23: Administrative Difficulties/Congestion of Court Docket

78.     Factor 23, the relative administrative difficulty in the two *fora* resulting from congestion of the courts' dockets weighs in favor of transfer.  While congestion may not be an issue due to the Courts' streamlined processes; as set forth above, having the bankruptcy cases in Delaware and the adversary proceeding in the Western District of Texas would likely result in administrative difficulties regarding scheduling, and could result in inconsistent judicial findings.

### Factor 24 Public Policies of the Fora

79.     This factor weighs in favor of venue transfer.  The Third Circuit has a strong policy in favor of centralization of cases.  *See In re Hayes Lemmerz Intern. Inc.,* 312 B.R. 44 (Bankr. D. Del. 2004).  The policy of centralization is best advanced by transferring the Debtors' bankruptcy cases to the Bankruptcy Court for the Western District of Texas where that court will have to determine core and non-core matters related to these estates.  Oliphant tacitly conceded that venue lies in the Bankruptcy Court for the Western District of Texas, when it removed the Texas Litigation to that court.  Neither the Debtors nor the Oliphant parties have sought to transfer the adversary proceeding from Texas to this Court.  Keeping the case in Delaware goes against Delaware's policy of centralizing cases, especially those that are deemed to be core matters.

### Factor 25 Familiarity of the Judge with the Applicable State Law

80.     Factor 25, the familiarity of the judge with the applicable state law, favors transfer. As set forth above, a bankruptcy judge in Texas is called on to routinely apply Texas law and is more familiar with doing so.

### Factor 26 Local Interest in Deciding Local Controversies

81.     This factor weighs in favor of transfer. There is always a "local interest in deciding local controversies at home."  *In re Amendt,* 169 F. App'x 93, 97 (3d Cir. 2006).  The Debtors'

Texas roots, the forum selection clause, the location of the parties, the witnesses, the assets and the Texas state laws at issue make Texas the better forum.

## CONCLUSION AND PRAYER

82.     The Debtors, and now their Chapter 7 Trustee, cannot carry their burden to show why a venue selection and waiver provision should not be respected in a no-asset chapter 7 case. Other than the place of incorporation, the Debtors have no connection whatsoever with Delaware. The Debtors have no on-going operations to reorganize, no employees, and a business model found to have been based completely on fraud.  The Plaintiffs are past the pleadings stage and well underway in lawsuits against the Debtors in Texas, which need to be completed in Texas, where the parties have substantial contacts.

83.     Should the Trustee decide to intervene in the Texas Litigation, he will have to do so in the Western District of Texas because venue for that dispute over the amount, extent of the Collateral collections and proceeds has already been set by the Oliphant Parties.

84.     For the foregoing reasons, it is appropriate to transfer the Debtors' bankruptcy cases to the Western District of Texas under 28 U.S.C. §§ 1404, 1412 and Bankruptcy Rule 1014(a)(1).

WHEREFORE, the Movants respectfully request that the Court enter the proposed order attached hereto, as **Exhibit A**, transferring the Debtors' bankruptcy cases to the Bankruptcy Court for the Western District of Texas, San Antonio Division.  The Movants further request such other and further relief, in law or in equity, to which they may show themselves to be justly entitled. The Movants reserve and preserve their rights to amend and/or supplement this Motion to transfer venue and the exhibits attached hereto.

Dated: June 25, 2025
Wilmington, Delaware

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Jonathan M. Weyand*
Robert J. Dehney, Sr. (No. 3578)
Jonathan M. Weyand (No. 6959)
1201 N. Market Street, 16th Floor
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 351-9200 Telephone
(302) 658-3989 Facsimile
rdehney@morrisnichols.com
jweyand@morrisnichols.com

- and -

**PULMAN LEFLORE PULLEN & REED, LLP**

Randall A. Pulman (*pro hac vice* forthcoming)
Shari P. Pulman (*pro hac vice* forthcoming)
Byron L. Leflore (*pro hac vice* forthcoming)
Kerry S. Alleyne (*pro hac vice* forthcoming)
2161 NW Military Highway, Suite 400
San Antonio, Texas 78213
rpulman@pulmanlaw.com
spulman@pulmanlaw.com
bleflore@pulmanlaw.com
kalleyne@pulmanlaw.com
www.pulmanlaw.com
(210) 222-9494 Telephone
(210) 892-1610 Facsimile

*ATTORNEYS FOR PLAINTIFFS*

**ROYAL LEA LAW OFFICE PLLC**

Royal B. Lea, III (*pro hac vice* forthcoming)
1901 NW Military Hwy, Ste. 218
San Antonio, Texas 78213
(210) 202-2395 Telephone
royal@royallealaw.com

*COUNSEL FOR JOHN PATRICK LOWE,*
*in his capacity as Court Appointed Receiver*